## UNITED STATES of America

v.

### Cornelio ESPINAL and Jose Antonio Dominguez, Defendants.

No. 89 Cr. 763 (KTD).

United States District Court, S.D. New York.

April 18, 1991.

---

Otto G. Obermaier, U.S. Atty., S.D.N.Y., New York City (Anne W. Patterson, Asst. U.S. Atty., of counsel), for U.S.

Bobbi C. Sternheim, New York City, for defendant Jose Antonio Dominguez.

Gilbert, Segall and Young, New York City (Jeffrey E. Livingston, of counsel), for defendant Cornelio Espinal.

## OPINION

KEVIN THOMAS DUFFY, District Judge:

On October 10, 1989, a two-count indictment was filed against defendants Cornelio Espinal and Jose Antonio Dominguez, charging them with: (1) conspiracy to possess with intent to distribute over 500 grams of a substance containing detectible amounts of cocaine, in violation of 21 U.S.C. § 846 (1989); and (2) possession with intent to distribute the same within one thousand feet of a school, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), 845a(a), and 18 U.S.C. § 2 (1989). Counsel was appointed pursuant to the Criminal Justice Act on behalf of Espinal; Dominguez retained private counsel.[1] On March 16, 1990, counsel for Dominguez brought on an omnibus motion pursuant to 18 U.S.C. § 4241(a) and Fed.R.Crim.P. 12(b)(3) and 14, for a hearing to determine Dominguez' competence to stand trial, for suppression of physical evidence seized, and for a severance.[2] On November 8, 1990, I ordered psychiatric and neurological exams for Dominguez to be conducted at Bellevue Hospital. A competency hearing was conducted before me on January 15th and 25th, 1991. Dominguez was remanded to the Manhattan Correctional Center ("MCC") pending resolution of the issues here. On February 13, 1991, the government provided me with several tape recordings and transcripts (translated into English) of various conversations that Dominguez conducted from the MCC with his wife and children. The following constitutes my findings of fact and conclusions of law relevant to the issue of competency.

## FACTS

On July 25, 1983, while Dominguez was employed as a mechanic in an automobile body shop, he suffered an accident on the job. It is unclear from the record, but either a nail or a piece of metal dislodged from a nail gun striking him in the left eyebrow. Dominguez was seen at Riverside General Hospital where x-rays were negative for fracture, however, a piece of foreign material remained in the left eyebrow. A few days later, Dominguez re-

---

1. This matter, as the facts will indicate, has had a long and unnecessarily obfuscated history, complicated by the fact that Dominguez has, since October 10, 1989, gone through two retained attorneys, who for lack of compensation and frustration in dealing with his consistent and wilful uncooperativeness, withdrew from the case. On December 19, 1990, I appointed counsel pursuant to the Criminal Justice Act and Bobbi Sternheim, Esq. has since undertaken the task of zealously, professionally, and patiently representing this difficult defendant.

2. The issue of severance has since been mooted because on May 29, 1990, Espinal withdrew a plea of not guilty and entered a plea of guilty to a superseding information of possession with intent to distribute a Schedule II controlled substance within a thousand feet of an elementary school, 21 U.S.C. §§ 812, 841(a)(1), (b)(1)(C), 845a(a), 18 U.S.C. § 2. Accordingly, Espinal waived his rights to a prosecution by indictment at that time. His sentencing has been deferred until after Dominguez is tried.

At this juncture, I see no need to suppress the physical evidence during the government's direct case at trial.

turned to the hospital and the metal was removed. He received a tetanus injection, and 3 stitches. Dominguez has not been gainfully employed since the accident.[3]

On September 26, 1989, Dominguez was arrested by the Drug Enforcement Administration ("DEA") for drug possession. After the arrest, Dominguez was searched. Seized from his person were certain personal papers, a wallet, a beeper, a watch, numerous keys, bridge tokens, a cocaine spoon, and $131.00 in cash. At the hearing, Dominguez' wife Ilonka testified that Dominguez was not responsible for his actions on the day that he was arrested, maintaining in substance that he was just in the wrong place at the wrong time. At the hearing conducted before me, she consistently professed Dominguez' mental instability and incompetence.

Specifically, Ilonka describes Dominguez as generally non-responsive and unable to care for himself. She claims that he is unable to dress himself or take care of simple hygiene, although he is lucid enough to toilet himself and he was never reported incontinent by either Ilonka or anyone at the MCC.

"He's always in bed or sitting down.... he does not help clean house, where before [the 1983 accident] we would divide up the [house] chores." She also claims that she had to re-teach Dominguez how to accomplish the simplest of tasks, for example, how to utilize eating utensils. Additionally, Ilonka claims that she and Dominguez have suffered an abnormal and impaired sexual relationship since the accident. Ilonka bore a child since then, but claims that Dominguez ignores the child and barely recognizes or speaks to her.

Three experts testified at the hearing. Two of the experts, Dr. Lawrence A. Siegel and Dr. Naomi Goldstein attest to the fact that the evidence overwhelmingly shows that Dominguez is a malingerer. Dr. Milford Blackwell, however, claims that Dominguez is mute, non-responsive, and suffers from catatonia. A fourth expert, Dr. Stephen Feldman a Bellevue neurologist, reported to me by phone his opinion that Dominguez was likely malingering because he displayed no physiological or neurological deficits.

## DISCUSSION

If, after a hearing on the issue of a defendant's competency, the district court:

finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General ... for such a reasonable period of time, not to exceed four months, as is necessary to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the trial to proceed.

18 U.S.C. § 4241(d) (1985).

■ Under a predecessor statute, 18 U.S.C. § 4244, the test for competency was whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding. He must rationally and factually understand the proceedings against him. *United States v. Hemsi*, 901 F.2d 293, 295 (2d Cir.1990) (citing *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960)). Now, the inquiry additionally involves assessing whether the defendant can assist counsel in specific ways such as "providing accounts of the facts, names of witnesses, etc." *United States v. Hemsi*, 901 F.2d at 295 (quoting *United States v. Mercado*, 469 F.2d 1148, 1152 (2nd Cir.1972)). Evidence relevant to determining competency includes medical and psychological opinion, aberrant behavior and demeanor at the hearing.

■ At the hearing, Dominguez was quiet and cooperative. Upon meeting any-

---

**3.** In a New Jersey civil action, Dominguez was adjudged mentally incompetent. Judge Robert E. Tarleton of the Superior Court of New Jersey Chancery Division Hudson County presided over that matter. Dominguez' wife Ilonka was appointed guardian on December 6, 1985.

one's gaze, he would quickly dart his eyes away. An interpreter was present and Dominguez willingly wore headphones in order to hear the Spanish interpretation. There was never a question about his hygiene and he has consistently looked neat and clean in appearance. He had no problems with incontinence at the hearing nor at the MCC.

At the hearing Dr. Siegel was asked whether Dominguez could have suffered some sort of dementia secondary to the trauma. Dr. Siegel answered that Dominguez lacks the aberrant behavior and affectation to short and long-term memory indicative of such dementia. He stated that because Dominguez' memory was non-specific and his responses both preconceived and consistent in their wrongness, he was likely feigning illness. For example, Dr. Siegel, in his pre-hearing examination and forensic report, states:

> The patient [Dominguez] says he is twenty seven years old [although he was thirty two at the time]. He says he does not know his date of birth or where he is. In response to questions he gives the date as August 1985 on three separate occasions. When a person has a loss of memory usually recent memory is lost before remote memory. One's birth date is the same as long as one lives. Therefore [Dominguez'] claim not to know his birth date is suspect. At the same time he claims not to know his birth date, he gives the same incorrect month and year each of three times he is asked over a period of approximately fifteen minutes. If he were truly disoriented one would truly expect some variability in the date that he gives. This would be because he truly did not know the date and would have such a poor memory that he wouldn't recall his prior guess.

Siegel Forensic–Psychiatric Opinion, December 28, 1990, at 2–3.

At the hearing, Dr. Siegel stated that he posed inane questions to see Dominguez' response. "I, for instance, asked if he was afraid of his toothbrush because no one is afraid of their toothbrush." In response, Dominguez stated that yes he was afraid of it because it bites him in his mouth. Dr. Siegel maintains that even with severely mentally ill patients, they consistently answer in the negative in response to that question, because if lucid enough to recognize what a toothbrush is, there is usually no fear displayed in connection with something so benign.

Dr. Feldman in his neurological/physiological exam stated that Dominguez carefully calculated all of his responses, tailoring them to be incorrect. For example, Dr. Feldman reported having touched Dominguez' hand, asking him whether he felt the stimulus. Dominguez responded in the negative. Then the doctor asked Dominguez where it was that he did not feel the touch and Dominguez pointed to the precise spot on the hand that was touched to show where he purportedly did not perceive the stimulus. Additionally, Dominguez did not present with any brain pathology as evidenced by computerized axial tomography ("CAT")[4] scan and electroencephalogram ("EEG").[5] The only abnormality shown was some swelling of the meninges, membranes that envelop the brain and spinal cord. However, none of the physicians found this to be either remarkable or necessarily pathological.

---

**4.** A CAT scan is a form of: "radiography in which a three dimensional image of a body structure is constructed by computer from a series of plane cross-sectional images made along an axis." Webster's Medical Desk Dictionary (1986). More specifically it is:

> Tomography where transverse planes of tissue are swept by a pinpoint radiographic beam and a computerized analysis of the variance and absorption produce a precise reconstructed image of that area. This technique has a greater sensitivity in showing the relationship of structures than conventional radiography

and has been used most successfully in diagnostic studies of the brain.
Tabers Cyclopedic Medical Dictionary, at 1,465 (14th Ed.1981).

> This technique is commonly used to take cross-sectional views of the brain in order to visualize a physiologic brain pathology or degenerative process.

**5.** This is a non-invasive technique whereby a "recording is made of the electric currents developed in the brain, by means of electrodes applied to the scalp, to the surface of the brain." Dorland's Medical Dictionary (24th Ed.1965).

According to Dr. Siegel, Dominguez had the full ability to conceptualize a question, recognize the information that was called for, and create a logical, yet incorrect response. For example: "The patient is shown five of the examiner's fingers and asked how many he sees. He says, 'Three.' He is shown ten of the examiner's fingers and asked the same question. He says, 'Eleven.'" Dr. Siegel maintains that these answers are suspect and that "[o]bviously he [Dominguez] understands the question requires a response of a number. If he is able to understand the question, it is most likely he is able to respond correctly." Additionally, in response to the question what is "the color of the examiner's pants which are blue," Dominguez responds "Black." When asked "the color of his light blue shirt, Dominguez says, 'White.'" Dominguez "clearly understands the questions but chooses to respond incorrectly."

Dominguez was examined by another forensic psychiatrist, Dr. Naomi Goldstein, who testified that her findings were consistent with those of Dr. Siegel. Specifically, that after in-depth examination, she ruled out any possibility of other proposed disorders, favoring a diagnosis of malingering. Although Dominguez was not found to be of the highest intelligence, it was her opinion that he was voluntarily evading questions and that he has the present ability to consult with his lawyer with a reasonable degree of rational understanding. In addition, her testimony can be construed to support a finding that Dominguez can rationally and factually conceptualize the proceedings against him and if he so chooses, aid in his defense.

On the other hand, Dr. Blackwell diagnosed Dominguez with an organic deficit and catatonia. Dr. Blackwell admitted, however, that he was not too impressed with the nail gun injury to Dominguez' eyebrow. Instead, he thought more impressive an injury that Dominguez later sustained to his head when he bumped into a door. However, that injury was immediately discounted by all of the other examiners and diagnosticians. Dr. Blackwell maintains that Dominguez is disabled and suffers from a mental defect which would not enable him to assess the charges against him, plan with his attorney, or aid in his own defense. Dr. Blackwell on a prior occasion had also found Dominguez incompetent. This diagnosis gave rise to the settlement of Dominguez' civil suit in which he was also deemed incompetent.

Additionally, Ilonka claims that Dominguez is completely non-responsive to verbal stimuli, refusing to acknowledge her and their children. But the tape recordings of conversations between Dominguez and his family originating from the MCC and initiated by him belie that assertion. Not only did Dominguez call collect from the MCC, making it known to the operator who was calling and to whom he was calling, but he carried on perfectly coherent conversations with Ilonka, Isabella ("Isa"), her daughter, and Josephina, the youngest daughter born of Ilonka and Dominguez.

At one point on the tapes, Dominguez asked to speak directly to his daughter and when she spoke to him in English at different points in the conversation, Dominguez repeatedly implored her to speak in Spanish. Government Exh. 25–1A, 2A. Perhaps this was to avoid being understood on the tapes, knowing that all MCC phone calls are taped, or perhaps it is due to the fact that Dominguez understands Spanish better than he does English and wanted to continue conversing with his daughter. In any event, Dominguez made his needs known to the child and they conversed in Spanish. In that conversation he asked his daughter to "blow daddy a kiss," thus acknowledging not only who she was, but, revealing that they share a long-term father-daughter relationship. Moreover, the child discussed her concerns about her mother, who was crying a lot over the past few days. Dominguez was interested in learning his daughter's perceptions of her mother's latest stresses, intending to and in fact willingly eliciting meaningful information from his daughter in that conversation. Indeed, Dominguez was acting in as paternal a fashion as any father could under the circumstances. This does not constitute the conversation of a catatonic man.

I find Dr. Blackwell's and Ilonka's testimony incredible by the objective evidence. Dominguez obviously perceives a secondary gain by feigning mental incompetence

for he may potentially evade prosecution. Even Dr. Blackwell admitted that the nail gun injury was slight and that he was more impressed with the fact that Dominguez at some point was hit in the head by a door, an injury which no other expert or examiner felt was impressive in the least. Dr. Blackwell admitted that he has testified numerous times in personal injury cases and that in 90% of the cases, he testified in favor of the plaintiff, perhaps indicating an overly sympathetic diagnostician. No neurological pathology was detected in Dominguez' brain, he simply displays curious times of lucidity, and Dominguez is conveniently never lucid when approached by doctors and medical personnel. Thus, this indicates his voluntarily choosing to avoid "competence."

"[A] defendant has the right under the Sixth Amendment to be present throughout his criminal trial." *United States v. Hemsi*, 901 F.2d 293, 296 (2d Cir.1990). If the court determines that a defendant's disruptive behavior is due to a mental disease or defect and it is beyond "his rational control, it would be forced to suspend or abort the trial." *Id.* However, if a defendant knowingly insists on misbehaving "to such an extent that his conduct is unduly disruptive," then he may be found to have voluntarily chosen to absent himself from the proceedings and he may be found to have waived his rights under the sixth amendment. *Id.*

In this case, Dominguez has succeeded in convincing me that he has a cognitive facility for aiding in his own defense and understanding the charges against him. Indeed, that he has gone to such lengths to avoid the same, merely indicates his complete understanding of the gravity of criminal prosecution. Additionally, he displays a present ability to consult with his lawyer with a reasonable degree of rational understanding. I have full confidence that Dominguez is psychologically adept enough to assist counsel in his own defense and that indeed he is now and has been malingering.

For the foregoing reasons, I find that Dominguez is well able and competent to stand trial on the instant indictment. After considering all of Dominguez' arguments, I find them to be totally without merit.

Therefore, this case will be set down for an immediate trial. A final pretrial conference will be held on May 2, 1991, at 9:30 a.m. in Courtroom 705.

SO ORDERED.